RANDOLPH L. MOTT, plaintiff in error, vs. PAUL J. SEMMES, garnishee, defendant in error.

A. was indebted, by stock note, to the M. & M. Bank of Columbus. By contract with B., the stock was transferred from A. to B., and A's note delivered up to him by the Cashier of the bank, upon the verbal undertaking of B., to pay the amount of the subscription to the bank. The bank subsequently ratified this transaction, B. having been elected a director upon the faith of this stock.

*Held,* That A. could not be made chargeable, as a debtor to the bank, upon n liability incurred by the bank some years thereafter; and if responsible at all, it could only be in equity, for fraudulently abstracting the assets of the corporation.

Garnishment, from Muscogee county. Decided by Judge WORRILL, November Term, 1857.

An action of trover was brought by the plaintiff in error against the Manufactures and Mechanics Bank of Columbus, to recover deposits he had made with the bank. Upon this action the plaintiff obtained a judgment in his favor, against the bank, and upon this judgment a summons of garnishment was issued against the defendant in error, as garnishee of the bank.

Upon the hearing of this summons, the plaintiff introduced (among others,) *E. S. Greenwood,* who testified, that he was a director of the bank in 1853 and 1854; and that when he went into the board of directors, there was a change of offi-

Mott vs. Semmes.

cers—the original ones having sold out or transferred their stock. Plaintiff's counsel asked what amount the purchasers paid for the stock. The defendant's counsel objected to the witness answering this question. The Court sustained the objection, and plaintiff's counsel excepted.

Plaintiff's counsel offered in evidence an instrument, (of which they proved the execution, and stated their readiness to show the authority of Grimes, the attorney, to execute it,) purporting to be an agreement for the transfer of 2,440 shares in the bank from Thornton and Kyle, two of the stockholders, executed by Grimes, their attorney, for $2,000, to J. T. Foster and D. K. Colburn, for which they were to make and endorse a promissory note for the amount, at 30 days from November 5th, 1853, and it was thereby agreed that the transfer and promissory note were to be deposited in the hands of Wm. Patrick, to be delivered up to Foster and Colburn, on their paying the said promissory notes at their maturity, otherwise, they should be returned to Thornton and Kyle, and the agreement for sale and transfer to be void.

Defendant's counsel objected to the introduction of this instrument. The Court sustained the objection, and plaintiff's counsel excepted.

The plaintiff's counsel offered in evidence the minute book of the directors of the bank. From the entries in this book, it appeared that Semmes became a subscriber for 1,500 shares in the bank, on the 5th of April, 1852. There was also an entry stating that $25,000 had been paid into the bank by Semmes and other subscribers, as a payment of 10 per cent on their shares, according to the charter. That on May the 8th, 1852, a meeting was held for the election of a President and Directors of the bank, when Semmes was elected President, and Kyle elected Cashier. It was then ordered that certificates of stock should be issued to the stockholders, and upon motion of one of the directors, D. Thornton, it was ordered, that the notes of the stockholders for the amount of

their subscriptions actually paid in, should be discounted, the notes to be payable 30 days after demand by the President.

Three transfers of shares were in evidence. One dated the 8th of May, 1852, for 550 shares in the bank, from Semmes to D. Thornton. The 2d dated the 12th of July, 1853, for 950 shares in the bank, from Semmes to Smith, and the 3d dated the 11th day of October, 1853, for 950 shares in the bank, from Smith to Kyle.

At a meeting of the directors of the bank, on the 12th July, 1853, Semmes resigned his office as President, which resignation was received, and Smith appointed his successor.

*Robert Kyle*, introduced as a witness by the defendant, testified, that he was the first Cashier of the bank, and continued as such till sometime in 1853; that he was Cashier when the notes were given for the capital stock paid in, as authorized by the order in the minute book. That Semmes only gave his note for $9,500, as he had transferred 450 of his shares to Thornton. Kept the note of Semmes till he transferred his 950 shares to Smith, which was done in the presence of witness, who, as Cashier, took from Smith his recognizance or verbal promise to pay the $9,500; gave up to Semmes his note; that the transaction was known to all the officers of the bank, and approved by them. That at the date of the transfer of the stock from Semmes to Smith, the latter, in consideration of the stock, assumed the debt of Semmes to the bank; that the bank accepted Smith's promise to pay, in lieu of the note of Semmes, and that he (witness) then delivered the note to Semmes, who then ceased to have any connection with the bank, or to owe it anything.

After the argument of counsel, the Court charged the jury as follows:

"It is conceded that the garnishee was one of the original stockholders in this bank, and subscribed for 1,500 shares of its stock, and subsequently, transferred 450 of his shares to D. Thornton, and that he paid in 10 per cent. upon the

amount of his subscription, and that in pursuance of an order of the directors of the bank, the money thus paid into the bank by Semmes was returned to him, and his promissory note amounting to $9,500, taken for the same, to be paid in 30 days after demand by the President of the bank. And now the question for you to determine is, whether Semmes is still indebted to the bank upon that note, or whether he has paid it off. The plaintiff insists that he is still indebted to the bank upon that note, and the garnishee that he has paid it. This, you perceive, is the question upon which the parties are mainly at issue. Now if, from the evidence, you should believe after this, that Semmes transferred the balance of his stock to H. S. Smith, and thereupon Smith promised the bank to pay this indebtedness of Semmes, and the bank then delivered the note to Semmes, and took Smith's verbal promise to pay it, in lieu of the note, then the debt is satisfied, the note is cancelled, and you will find the issue for the garnishee, otherwise, you will find for the plaintiff;" and if they found for the plaintiff, the Court gave the jury directions as to the form of their verdict.

Plaintiff's counsel requested the Court to give the jury the following charges:

" That if they believed from the evidence that the sum of $25,000, or any other sum, was actually paid to the commissioner by the persons subscribing for stock in the Manufacturers and Mechanics Bank of Columbus, and it was so paid as capital stock, and that the same was afterwards paid over by said commissioners, to the directors of said bank, that the money so paid became the property of said bank."

" That if the jury should believe from the evidence that the directors, after the money was so paid to them, permitted or authorized the stockholders to give their notes in lieu of the money so paid in, and receive the same back, no matter under what color or pretence done, and this was done to evade or get round the provisions of the charter requiring $25,000

in specie, or bills of specie paying banks, such arrangement and transaction is void; and if you should believe that the garnishee was a director at the time, or a party to that arrangement, and under it received back the amount paid in by him or any portion of it, the money so received by him is still the property of the bank."

" That if they should be of the opinion from the evidence, that the transaction of returning to the stockholders the money paid by them, by discounting their notes for the amount, was not to evade the provisions of the charter, and was done in good faith, and that the garnishee gave his note for the amount of the money paid in by him under that arrangement, then the note became the property of the bank, and the garnishee its debtor, and that the Cashier had no authority to give up that note to the garnishee upon the verbal promise of Smith or any other person to pay the bank the amount; and if they believe from the evidence that it was so given up to the garnishee, without any order of the board of directors, or their assent thereto, acting in the capacity of directors, that that transaction is void, and that Semmes still owes the bank the amount, unless paid in some other way."

" That if they believed from the evidence that the directors, on receiving the $25,000 from the commissioners, returned the same to the stockholders and received their notes in lieu thereof, with the view to make them the capital stock, and that these notes so received have never been paid in specie, or the bills of specie paying banks, that such an arrangement is an evasion of the charter of the bank, and void, and the persons so taking back the money so paid, are indebted to the amount so received, unless paid or discharged in some other way."

" That if the jury believed from the evidence that the directors, on receiving the $25,000 from the commissioners, returned the same to the stockholders, or permitted them to receive back the money paid in, and placed in the bank their notes in lieu thereof, with a view to make the notes so given the cap-

Mott vs. Semmes.

ital stock so paid in, or to represent it, that would be an eva-sion of the charter, illegal and void, and the money so re-ceived is still the property of the bank."

" The Cashier of a bank has the implied power to negoti-ate the securities and manage the funds of the bank, but he has no right to discount notes, or to deliver up the capi-tal of the bank to any original stockholder, on the promise of a third party to pay the same : there is no such power implied by virtue of his office as Cashier."

" Neither the Cashier of the Manufacturers and Mechanics Bank, nor its board of directors, had the right to substitute the notes of the directors for the specie capital paid in. Di-rectors loaning to themselves the capital, payable 30 days af-ter the demand of the President, is not a discount of notes, but is a substitution of the notes of the directors for the spe-cie capital paid in, and such substitution is illegal."

The Court refused to give all these charges as requested, except the first; and to this refusal of the Court to charge as requested, and to the charges so given by the Court, except the first requested charge, plaintiff's counsel excepted.


*By the Court.*—LUMPKIN J., delivering the opinion.

We are quite clear, that whether Semmes can be made lia-ble to creditors of the bank in another proceeding or not, he cannot by process of garnishment. The record shows, that he transferred his stock to Smith—Smith agreeing to pay the amount due thereon to the bank. And thereupon, the Cash-ier surrendered up to Semmes his note. No attempt has ever been made by the bank, to charge him as a debtor to the bank, or to hold him responsible in any way, upon his origi-nal subscription for stock.

XXIV.—35

It is conceded, that if this substitution of liability had been made by the bank, it would have discharged Semmes. It was done by the Cashier; and we are authorized to assume that the act was ratified by the bank. We infer this, not only from its acquiescence, but from the further fact, that upon the faith of this transaction—constituting Smith a stockholder in the place of Semmes—he was made a director of the bank, which he could not be unless a stockholder, and he was no stockholder, unless this contract or arrangement between the Cashier, Semmes and himself made him one.

This is not all. This very stock was subsequently transferred by Smith, for no other or further assignment of the stock was ever made by Semmes. So that those who controlled the bank, at the time Mott, the plaintiff, made his deposit—to recover which this suit is brought—must necessarily have derived their right and authority through Smith, and upon the faith of this transfer by Semmes. So that the proof, as to the ratification of this act, on the part of the bank, is conclusive.

In *Phillips vs. Wesson et al.*, 16 *Ga. Rep.* 137, this Court say, "But there is a technical difficulty which cannot be well overcome, as to this remedy by garnishment. Admitting all the facts charged in the bill to be true, Phillips, perhaps, could safely swear, that he owed Stephens nothing, and that he had nothing of his in his hands. For, this being a fraudulent arrangement between them to defeat the creditors, Phillips is not liable to account to Stephens, although he may be to the creditors. And notwithstanding the transfer by Stephens may be a nullity, as to his creditors, still, it will be perceived, that the process of garnishment does not make and meet the issue fairly. At any rate, this legal remedy is not complete. Phillips may swear, in answer to the garnishment, that he owed Stephens nothing; yet, if he admitted the facts charged in the bill, he would subject himself, undoubtedly, not to a prosecution for perjury on his former oath, but to a

decree in favor of the creditors of Stephens, to account for the goods or their value."

If the Court reasoned rightly, in respect to a case confessedly fraudulent, what ought to be its opinion in the case before us, where not a debt had been contracted by the bank, when Semmes' note was delivered up to be cancelled. And when Mott's debt had no existence for years afterwards. And especially when it appears, that Semmes had washed his hands of this charter, long before it went into the possession of its foreign purchasers. Perhaps for the very reason that he would not lend his sanction to such a transfer.

Let the creditors then go into equity, and, if they can, subject Semmes for aiding and abetting in the fraudulent · abstraction of the effects of this bank. But he cannot be reached by process of garnishment, if he has been discharged by the bank. The witness, Kyle, swears positively that the money was paid to the bank upon this transferred stock. I put no stress upon this proof in this opinion.

Judgment affirmed.

BENNING J. concurring.

On the day of the organization of the bank, the directors made an order in these words : " Ordered, that the note of the stockholders for the amount of their several subscriptions paid in, be discounted ; the notes to be payable, thirty days after demand by the President of the bank."

This order was immediately carried out. The amount coming to Semmes was $9,500, for which he gave his note. This was on the 8th of May, 1852.

This transaction was void, or it was valid. It must have been the one or the other. If the purport was merely to let the stockholders have the use of the money, until the bank commenced business, and not to let the bank commence business, until the money was returned, the transaction was not forbidden by any law with which, I am acquainted. It

certainly was one that could affect none but the parties to it. To show that this was the purpose, it might be, perhaps, that nothing ought to be deemed sufficient short of proof, that the bank did not commence business until the money was returned, *i. e.*, until the notes were paid. This, however, is a point which I do not think requires decision.

Be this then, as it may, the transaction was void, or it was valid. That is certain.

If it was void, the effect was, that the stockholders, for the sums respectively received by them, became respectively indebted to the bank *in spite* of the transaction; if it was valid, the same thing happened *by virtue* of the transaction. Either way, the effect was precisely the same, viz: that the stockholders respectively became indebted to the bank, in the sums which they respectively received from the bank. In the case of Semmes, this sum was $9,500; for which he gave his note.

Being thus indebted to the bank, their debts stood like any other debts due to the bank; that is they stood subject to be paid or extinguished, in the same way as other debts due to the bank, were subject to be paid or extinguished.

Afterwards, on the 12th of July, 1853, Semmes, and H. S. Smith, and Kyle, the Cashier of the bank, made this arrangement, viz: that Semmes should transfer his stock to Smith, and Smith should pay the bank for the stock, and the bank should surrender to Semmes his note.

Accordingly, on the same day, Semmes transferred his stock to Smith, and Smith verbally promised Kyle to pay the bank for it, and Kyle surrendered to Semmes his note.

Afterwards, but long before the existence of the summons of garnishment, Kyle, acting for Smith, paid the bank the said amount that Smith had promised to pay the bank, for the stock which he had got from Semmes.

Now, did all this amount to an extinguishment of Semmes' indebtedness to the bank.

The plaintiff in error says no. ·He says that Kyle had no original *authority*, as cashier, to make this arrangement, and that the arrangement was never ratified by the board of directors.

But is this all true? I think not.

First. The arrangement was made as above stated, on the 12th of July, 1853, a part of it being the transfer by Semmes of his stock to Smith. This transfer had to be upon the books of the bank. Therefore, it was made, probably, in the bank; especially, is this to be said, as Kyle, the cashier, was a party to the arrangement. On that same day, the directors had a meeting, for on that day, they elected *Smith a director in Semmes' place;* and on that day, Semmes resigned his office of president. Now, is it not clear beyond a reasonable doubt that all these things occurred at the same time and place. I think so. If they did, then it follows, that this arrangement of Kyle's with Semmes and Smith, was made in the banking house, and under the very eyes of the directors whilst in session.

At all events, the board's electing Smith a director, shows, that they ratified this arrangement, for, to be eligible as a director, he had to be a stockholder, and it was only through this arrangement, that he could have been a stockholder. In making him a director, they must, therefore, have sanctioned the arrangement.

Secondly Kyle says that he paid the bank for Smith, what Smith, according to the arrangement, was to pay the bank.

In receiving such pay, the bank had, of course, to sanction the arrangement.

I think it clear, then, beyond a reasonable doubt, that the arrangement was, if not authorized, at least ratified, by the bank.

And what is there in such an arrangement, that creditors of the bank, even if they were creditors contemporaneous, and, not long subsequent, could justly complain of? The bank thus squandered none of its assets. If it gave up to

Semmes, $9,500, it got back in place of it $9,500 from Smith. Even if it gave up $9,500 to Semmes, in exchange for a debt of that amount on him, and then gave up that debt to Smith, for a like debt on him, what is there in it? Smith, for ought that appears, is as solvent as Semmes. The creditors of the bank are certainly, not entitled to have $9,500, twice, once from Smith, and once from Semmes.

These things being so, there is nothing in the charge, or the refusal to charge, to call for a new trial, so far as I can see.

Hence, I think that one ought not to be granted.

McDONALD J., dissenting.

The plaintiff in error sued and obtained judgment, against the Manufacturers and Mechanics Bank of Columbus, in the Superior Court of Muscogee county. During the pendency of the action a summons of garnishment was sued out by the plaintiff in error, in the usual form, requiring the defendant in error to appear and answer what he was indebted to the defendant in the pending action, &c. He appeared and deposed that he owed the defendant nothing &c. The plaintiff in error traversed the garnishee's affidavit and on that issue the parties went to trial. It appeared in evidence that the commissioners appointed in the act of incorporation to receive sebscriptions of stock, gave public notice that at a specified time and place they would open bonds for subscription of the capital stock of said Bank.

The garnishee in this case subscribed fifteen hundred shares. The stock was all taken, and the commissioners certify that ten per cent. of the capital stock was paid to them, being twenty-five thousands dollars. Reciting these facts in their advertisement, they published a notice to the stock holders to meet on the 8th day of May ensuing, (1852) at the counting room of Grimes, Kyle & Thornton to elect five directors. The stockholders met agreeably to said notice. They

Mott vs. Semmes

elected their directors who proceeded, on the same day, to organize, by the election of a President and Cashier. The commissioners for receiving the subscription and the 10 per cent. of the capital stock subscribed, paid to the directors the twenty-five thousand dollars. The defendant in error on the same day, transferred to Dozier Thornton four hundred and fifty shares of the stock subscribed by him, the directors having previously passed an order that certificates of stock be issued to the stockholders for the amount of stock which they had respectively subscribed. On the same day, the 8th of May 1852, the board of directors passed an order, that the notes of the stockholders for the amount of their several subscriptions, actually paid in, be discounted, the notes to be payable thirty days after demand. by the President of the bank. On the sixth of December 1852 an election was held for directors and the same persons were elected, and the defendant in error was re-elected President of the bank. Robert Kyle testified that on the 12th day of July 1853 the defendant in error transferred the remaining part of his stock to H. S. Smith, and on the same day resigned his offices of director and President, and in his stead H. S. Smith was elected diector and Sterling F. Grimes was elected President. He was the first Cashier of the bank and held the office until the latter part of the year 1852. He was cashier when the notes of the directors were discounted. The note of the defendant in error was discounted for the sum of nine thousand five hundred dollars. After defendant in error transferred his stock to Smith, Kyle, acting on his own responsibility as cashier, gave up to the defendant in error his note for $9,500. This transaction was known to every officer of the bank, and assented to by them, but was never acted on at any regular meeting of the board.

At the time of the transfer of the stock by Semmes, the defendant in error, to Smith, Smith purchased said stock of Semmes and assumed the debt of Semmes to the bank to the amount of $9,500. He further testified that the bank accept-

ed Smith's promise to pay, in lieu of Semmes' note, where-upon he as cashier delivered up to Semmes, his note, who ceased to have any connection with the bank and owed it nothing. This witness having testified that he, as cashier took Mr. Smith's "recognizance" for the $9,500, was asked on the cross examination what he meant by taking Mr. Smith's recognizance and answered that he took Mr. Smith's verbal promise to pay that amount and on that he gave up to Mr. Semmes his note of $9,500. He further testified that Smith never paid said sum, nor any part of it, as far as he knew, but that he had paid it for him.

Elbridge S. Greenwood testified, that he was a director of the bank from about the 5th of December 1853 to the 3d of July 1854. When he went into the board there was a change of officers, the original owners of the bank having sold out and transferred their stock. The bank had done no business of any kind nor contracted debts, so far as he knew, and it did no business and contracted no debts while he was connected with it. The bank afterwards issued bills, did business and failed. When the bank was turned over to the board of which he was a member, nothing was transferred that he knew of, but the stock and unsigned bills and plates. While he was a director he never saw in the bank, any specie, the bills of other banks, nor any money of any sort, nor did he see the note or notes of the defendant, the garnishee, nor any other notes. The bank had a book of minutes and transfer book and blank books ready for use. The witness was not present at the sale testified to by him, and could not say what was turned over. There was a cashier, while he was a director, whose duty it was to take care of the money and notes of the bank; and it was possible he might have had money and notes, and he might not have seen them.

Samuel A. Billing testified that he was elected director and President of the bank in the latter part of the year 1853 and resigned about July 1854. About that time, or a short time before, the capital stock, except a small number of shares, had

been transferred by the former owners to gentlemen in New York, and that while he was President and director he never saw nor knew of their being in the bank any specie, bills of other banks, notes or any other property or assets, except a plate, bills not filled up and blank books. When the bank was transferred, if anything was turned over except the bills, plates, books and the charter and capital stock, he never knew it. He never saw or knew of anything else being in the bank. This witness further testified that while he was connected with the bank, it did no business, contracted no debts and kept no books. Bills were signed preparatory to being issued. They were never issued but destroyed.

Sterling F. Grimes was acting as cashier; that it was the duty of the cashier to keep the cash and notes of the bank and it was possible he might have had the money and notes and the witness not know it.

The presiding Judge charged the jury, among other things, that, if they believed from the evidence, after this, (after Semmes had given his note for $9,500) Semmes transferred the balance of his stock to Hampton S. Smith, and thereupon Smith promised the bank to pay this indebtedness of Semmes, and the bank then delivered the note of Semmes, and took Smith's verbal promise to pay it, in lieu of the note, then the debt is satisfied, the note is cancelled and they would find the issue for the garnishee. The counsel for the plaintiff submitted to the Court, in writing, six distinct requests to charge the Jury, all of which the Court refused to give to the jury, except the first, and the counsel for the plaintiff, excepted to the charge of the Court to the Jury as given and to the refusal of the Court to charge as requested.

A majority of this Court, affirm the judgment of the Court below on all the exceptions. From this judgment of affirmance I dissent.

If the bank have the right to recover of the defendant the sum of $9,500 or any other sum, under the evidence submitted in this cause, then the plaintiff in garnishment was enti-

tled to recover, and if the principles, upon which the charge was founded, would have been wrong if the suit had been by the bank against the garnishee, they cannot be sustained against the garnishing creditor. The same may be said in reference to the requests made of the Court in writing to charge the jury. If they ought to have been given in a suit by the bank, they should have been given in this cause. The requests of counsel to the Court to charge the jury will be seen in the Reporter's statement of the case.

Whether the charge as given was right depends on the state of facts upon which it was predicated. The charge of the Court recited above has reference to the transaction between Smith and the defendant in error and the bank in regard to the sale and transfer of the stock, the substitution of Smith's verbal promise to pay for the note of defendant and · the delivery up of the note to him. The Court charged the jury, that "if Smith promised the bank to pay the indebtedness of Semmes and the bank then delivered the note of Semmes and took Smith's verbal promise to pay it, in lieu o the note, then the debt is satisfied, the note is cancelled and you will find the issue for the garnishee." There was no evidence in my opinion sufficient in law to warrant· this charge. The witness on whose testimony this charge was based was Robert Kyle; and he certainly testified in so many words that the bank accepted Smith's promise to pay in lieu of Semmes' note, whereupon he as cashier delived up to Semmes his note ; yet he had shown how this thing was done in the prior part of his evidence: for he had already stated that the defendant in error had transferred his nine hundred and fifty shares to H. S. Smith in his presence as cashier; and that he, *acting on his own responsibility as cashier* took from Mr. Smith his recognizance for the $9,500 and gave up to Mr. Semmes his note. He says this transaction was known to every officer of the bank and assented to by them, *but was never acted on at any regular meeting of the board.* It could not have been a corporate act, for the mem-

bers of a corporation aggregate cannot express their assent individually and severally to a proposition so as to bind the body. There was nothing in the minutes in respect to this matter assented to in even the irregular and ineffectual manner spoken of by this witness. There is another matter to be considered in this connection. This witness' understanding of language is singularly defective. He says he took Mr. Smith's *recognizance* for the $9,500, and when asked, what he meant by taking Mr. Smith's recognizance, he replied that he took Mr. Smith's *verbal promise to pay.* If he had been asked what he meant or whom he meant by officers of the bank he might have replied, he meant the directors, or he might have said the President and cashier, himself and the defendant; for they were the only persons known as officers under the charter and who had been sworn under the requisition of the charter. If he meant, when he used that term, " officers," the President and cashier and them alone, then they had no authority to do a corporate act and could not bind the bank, and they were not the bank.

But the cashier testified that he did the act on his own responsibility as cashier  If this act fell within his ordinary *ex officio* powers as cashier, then the bank was bound by it, as if it were its own act. The cashier is the executive officer of the bank. He is entrusted with power to collect and pay its debts, and it is through and by him that its securities are discharged and transferred. He must be presumed to have authority to do all these things after a bank is organized and in operation, provided the person with whom he deals does not know his want of authority to do them, if his power be restricted. This is essential to the security of the the public against frauds by one held out to them as an authorized agent. This power, however, does not extend to giving out the capital stock the money or effects of the bank held as capital stock, prior to the banks going into operation; for although elected cashier, he is not held out to the community as having authority of any sort, before the bank commences business. If a note dis-

counted by the bank be paid, he may deliver it up, but he has no power to deliver it without payment. This bank had never been in operation, and, in fact, if the parties acted in good faith in withdrawing the capital subscribed and paid over by the commissioners under pledges to return it thirty days after the call of the President, no individual stockholder had the right to withdraw his written undertaking, and substitute therefor the mere verbal promise to pay of another person, however responsible he may have been. Such a transaction does not amount to a payment, and the bank is not bound thereby—and it ought to have been so given in charge to the jury.

The second request to charge the jury, made of the Court in writing by the counsel for the plaintiff, ought to have been given. I had no doubt upon this request at first, for it occurred to me that the stockholders might have merely desired to postpone for a short time the business of banking on their subscribed and paid capital, and might have withdrawn it, to be returned thirty days after the call of the President, for the purpose of saving the interest on their money. If the call had ever been made and the money returned, there could have been no harm in it. No one could have been injured by it. But the call was never made and the money never returned, or at least it does not so appear. The bank went into operation, and the plaintiff became its creditor and obtained a judgment. If the whole arrangement was made to evade the salutary requisition of the charter by which a substantial capital was to be secured as a basis of the circulation of the bank, it was void, and each stockholder remained indebted to the bank the amount which he withdrew from it.

For reasons stated in my remarks on the charge of the Court as given to the jury, I think the request of counsel as thirdly asked of the Court ought to have been delivered to the jury.

If the original stockholders, withdrew the amount of their paid subscriptions from the bank, and substituted therefor

Mott vs. Semmes.

their notes, with the view of making their notes the capital stock, and the bank was put into operation without the payment of the notes in specie, or such funds as the charter required the capital stock to be paid in, and the bank has failed, they are respectively still liable for the sums by them severally withdrawn. If stock be subscribed and paid in, it must remain, unless the stockholders agree to surrender their charter or abandon their privileges under it, and in either of those events the bank is at an end. If the stockholder wishes to sell his shares, he must compel his purchaser to pay him the value, and if he colludes with the purchaser to withdraw from the bank the capital paid in for the protection of the public, and it is withdrawn, they become indebted to the bank the amount collusively and fraudulently withdrawn. It is a matter for the jury to pass on, upon the whole evidence in the case. The witness Kyle said that he paid the debt for Smith, and yet no money, or notes of any sort were turned over to the purchasers within the knowledge of the new President and directors of the bank, all of whom, by the charter, were bound to be stockholders in their own right. The jury had the right to weigh this evidence.

For the reasons already assigned I think the fifth and sixth instructions asked by plaintiff's counsel ought to have been given. The cashier of a bank cannot discount a note. If he cannot discount a note he cannot discount a verbal promise to pay. He has no *ex officio* power until the bank, of which he is the cashier, goes into operation. Until then he is the limited agent of the corporation, governed strictly by its legally expressed orders and authority. He is clothed with *ex officio* powers when the bank begins business, from the necessity of the case. There is no such necessity before. His *ex officio* powers are by no means, general, they are limited to such matters and things as are embraced within the duties of his office, and in relation to which he must be presumed to have authority to act; *Bank of the U. S. vs. Dunn* 6 *Pet.* 59.

He cannot discount a note. He cannot give up a discounted note until paid, and if he does, the parties to the note must remain indebted to the bank.

I am of opinion, therefore, that the judgment of the Court below ought to be reversed.